1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CENTER FOR BIOLOGICAL DIVERSITY,
LOS PADRES FORESTWATCH, SIERRA
CLUB, DEFENDERS OF WILDLIFE and
CALIFORNIA NATIVE PLANT SOCIETY,

        Plaintiffs,

   v.

U.S. FISH AND WILDLIFE SERVICE,
NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION,
NATIONAL MARINE FISHERIES SERVICE
and U.S. FOREST SERVICE,

        Defendants.
_____/

No. C 08-01278 MHP

**MEMORANDUM & ORDER**

**Re: Cross-Motions for Summary Judgment**

     The Center for Biological Diversity and several other conservation groups ("plaintiffs") brought this action against three federal agencies ("defendants"), asserting violations of those agencies' responsibilities under the Endangered Species Act ("ESA"). Specifically, plaintiffs challenge two biological opinions underlying the U.S. Forest Service's revised forest plans for four southern California forests, alleging that the biological opinions did not contain incidental take statements as required by the ESA. Now before the court are cross-motions for summary judgment. Having considered the parties' submissions and arguments, and for the reasons set forth below, the court enters the following memorandum and order.

**United States District Court**
For the Northern District of California

BACKGROUND

I.      The Parties

        Plaintiff Center for Biological Diversity is a tax-exempt, non-profit membership organization with nearly 60,000 members, including 4,800 members in southern California.  Hogan Dec. ¶ 2.  Plaintiff Los Padres ForestWatch is an 800-member, community-based non-profit organization headquartered in Santa Barbara, California, which seeks to protect the Los Padres National Forest and other public lands along California's Central Coast.  Kuyper Dec. ¶ 2.  Plaintiff Sierra Club is a 700,000 member non-profit organization which currently leads over one thousand outings per year to the Los Padres, Angeles, San Bernardino and Cleveland Forests.  Corcoran Dec. ¶¶ 4-5.  Plaintiff Defenders of Wildlife is an organization with over 535,000 members nationwide that advocates for the protection of all native wild animals and plants in their natural communities.  Flick Dec. ¶ 4.  Plaintiff California Native Plant Society is a statewide non-profit organization of amateurs and professionals with a common interest in California's native plants.  Anderson Dec. ¶ 2.

        Defendant U.S. Fish and Wildlife Service ("FWS") is an agency within the U.S. Department of the Interior with responsibility for administering certain provisions of the ESA pertaining to environmental impacts to freshwater fish and wildlife species.  Defendant National Marine Fisheries Service ("NMFS") is an agency within the U.S. Department of Commerce's National Oceanic and Atmospheric Administration with responsibility for administering certain provisions of the ESA pertaining to environmental impacts to anadromous fish (i.e. fish that migrate from salt water to spawn in fresh water) and marine species.  Defendant U.S. Forest Service ("Forest Service") is an agency of the U.S. Department of Agriculture and is responsible for the management of the national forest system.

II.     The Revised Plans

        Plaintiffs challenge the Forest Service's 2005 revised forest plans for the Angeles, Cleveland, Los Padres and San Bernardino National Forests.  The Forest Service issued these plans ("the revised plans") pursuant to regulations implementing the National Forest Management Act

2

**United States District Court**
For the Northern District of California

("NFMA") which require the Forest Service to update forest plans every ten to fifteen years. The revised plans "describe the strategic direction at the broad program-level for managing the land and its resources over the next 10 to 15 years." Forest Service Administrative Record ("FS AR") 4.4.3.2 at 1. Among other things, the plans set forth the desired conditions for the various landscapes in the respective forests and identify land use zones that are intended to be consistent with those conditions. Id. at 2. There are seven different types of land use zones, and the type of human use allowed in a particular area depends upon how the area is zoned. FS AR 4.4.3.4 at 2. For instance, commercial uses and activities such as camping and recreation are prohibited in "critical biological" zones, which are "the most important areas on the national forest to manage for the protection of species-at-risk." Id. at 8. Forest managers "work from within [the revised plans'] strategic framework as they make decisions and propose site-specific projects . . . ." FS AR 4.4.3.2 at 4.

III.     The Forest Service's Biological Assessments

Before issuing the revised forest plans in 2005, the Forest Service prepared, as required by the ESA, two biological assessments analyzing the potential effects of implementation of the revised plans. The first biological assessment analyzed the potential impact of the revised plans on forty-five ESA-listed freshwater fish and wildlife species, i.e. the species for which consultation with the FWS would be required, as well as one candidate species. That biological assessment conducted a species-by-species evaluation for each of the ESA-listed species. While recognizing that uncertainty is "inherent in this kind of analysis," the biological assessment found that implementation of activities under the revised plans "may affect and is likely to adversely affect, 40 listed species and 1 candidate species" and "some designated critical habitat for 14 of the 41 species." U.S. Fish and Wildlife Service Administrative Record ("FWS AR") 3741-3743. The biological assessment noted that the revised plans were intended to provide broad, program-level direction for managing the land, not to make project-level decisions or commitments to any particular projects. FWS AR 3375.

The second biological assessment addressed the potential impacts of the forest plans on the three species which would require consultation with the NMFS: the Stellar sea lion and two

3

1  evolutionarily significant units (ESUs) of steelhead trout.  See National Marine Fisheries Service

2  Administrative Record ("NMFS AR") 579.  Like the first biological assessment, this assessment

3  noted the difficulty in predicting the potential effects of a programmatic-level document but found

4  that implementation of activities contemplated by the plans was likely to adversely affect the two

5  ESUs of steelhead trout, though not their critical habitat.  See id. at 625-627 & 655.

6          Upon completion of the biological assessments, the Forest Service sent the appropriate ones

7  to the FWS and the NMFS respectively, with requests to enter formal ESA Section 7 consultation.

8  The Forest Service explained that the proposed actions for which it was seeking consultation, i.e. the

9  revised plans,

10         describe the strategic direction and provide broad program-level direction for
           managing the land and its resources.  They outline the vision, objectives, strategies,
11         standards, land use zoning and suitable uses for each land use zone.  The Forest Plans
           do not make project level decisions, nor do they contain commitments to implement
12         specific projects.  Those decisions are made after more detailed analysis, further
           public comment, and project-level consultation, as needed.

13  FWS AR 3358; NMFS AR 660.

14

15  IV.     The Expert Agencies' Biological Opinions

16         In response to the Forest Service's requests for formal consultation on its forest plans and

17  related biological assessments, the FWS and the NMFS ("the expert agencies") each prepared a

18  biological opinion.  The expert agency biological opinions assessed the proposed forest plans with

19  the understanding that the plans did not themselves authorize site-specific projects.  See FWS AR 8;

20  NMFS AR 5.  In light of this understanding, the biological opinions assessed the forest plans'

21  impacts on a species-by-species basis.  Both FWS and NMFS concluded that implementation of the

22  revised plans would not jeopardize any ESA-listed species or adversely modify any designated

23  critical habitat.  The issuance of the biological opinions concluded the formal consultation pursuant

24  to ESA section 7.  See 50 C.F.R. § 402.14.

25         Although the FWS and NMFS each concluded that the revised plans were not likely to

26  jeopardize the listed species under their respective purviews, neither agency concluded that the

27  revised plans completely eliminated the potential for contemplated activities to cause adverse

28

4

impacts, i.e. "take" (killing, trapping, wounding, etc.) of listed species.  The FWS biological opinion

identified several Forest Service programs "likely to adversely affect" listed species, including road

and trails management, recreation management, and several other areas.  FWS AR 1 at 23-28.  The

opinion noted that the use of roads and recreation sites under the plan can result in effects such as

the crushing of animals, invasion of non-native species and harmful vegetation clearing.  Id. at 24.

The NMFS opinion similarly analyzed the manner in which the Forest Service programs described

in the forest plans may be expected to adversely affect steelhead and Stellar sea lion populations.

NMFS AR 1.  However, the expert agencies both indicated that they were unable to definitively

anticipate the amount, extent, location or timing of any potential take.  See, e.g., FWS AR 296.

Neither FWS nor NMFS issued an incidental take statement (ITS) with its biological opinion.

Instead, each of the biological opinions indicated that an ITS would be provided as appropriate at the

time that site-specific projects are undertaken.  Despite the absence of ITSs, both biological opinions

state, as set forth in 50 C.F.R. section 402.16, that consultation on the revised plans must be

reinitiated if, among other things, "the amount or extent of incidental take is exceeded."  FWS AR 1

at 297; NMFS AR 1 at 32.


LEGAL STANDARD

I.      Summary Judgment

        Summary judgment may be granted only when, drawing all inferences and resolving all

doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see generally Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-255 (1986).  A material fact is "genuine" if the evidence is

such that a reasonable jury could return a verdict for the non-moving party.  Anderson at 248.  The

moving party bears the burden of identifying those portions of the pleadings, discovery and

affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the non-moving party

must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial.  Fed R. Civ. P. 56(e); see Anderson at 250.

II.     Endangered Species Act ("ESA")

        The ESA requires the Secretaries of the Interior and Commerce to promulgate regulations listing plant and animal species that are "threatened" or "endangered" by extinction and to designate "critical habitat" for such species.  16 U.S.C. § 1533; Bennett v. Spear, 520 U.S. 154, 157-158 (1997).  Section 9 of the ESA establishes a blanket prohibition on the "taking" of any member of a listed endangered species.  16 U.S.C. § 1538(a)(1)(B); Oregon Natural Resources Council ("ONRC") v. Allen, 476 F.3d 1031, 1033 (9th Cir. 2007).  To "take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19); ONRC at 1033 n.1.

        Section 7 of the ESA allows statutorily-defined "applicants," including Federal agencies, to carve out limited exceptions to Section 9's blanket prohibition under certain circumstances.  16 U.S.C. § 1536(a)-(c), (o); 50 C.F.R. § 402.02.  Under Section 7, each federal agency must "insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical."  16 U.S.C. § 1536(a)(2).  The applicable regulations define an "action" to include (somewhat redundantly) "actions directly *or indirectly* causing modifications to the land, water, or air."  50 C.F.R. § 402.02 (emphasis added).  If a listed species may be present in the area of a proposed agency action, the "action agency" must prepare a "biological assessment" to determine the potential effects of its proposed action on the listed species and their critical habitat.  Id. § 1536(c)(1); ONRC at 1033.  If the action "may affect" a listed species or its critical habitat, the action agency must consult with one of two expert agencies, the National Marine Fisheries Service ("NMFS") or the United States Fish and Wildlife Service ("FWS"), depending upon the species.  16 U.S.C. § 1536(a)(2); see also 50 C.F.R. § 402.14(a).

6

United States District Court

For the Northern District of California

1    During the consultation process, the relevant expert agency "must provide the [action]

2  agency with a written statement (the Biological Opinion) explaining how the proposed action will

3  affect the species or its habitat." Bennett, 520 U.S. at 158, citing 16 U.S.C. § 1536(b)(3)(A).  If

4  either of the expert agencies concludes that the proposed action will not result in jeopardy or adverse

5  habitat modification (or develop a "reasonable and prudent alternative" to avoid this result), they

6  "must provide the [action] agency with a written statement (known as the Incidental Take

7  Statement)." Bennett, 520 U.S. at 158, citing 16 U.S.C. § 1536(b)(4).  The incidental take statement

8  must: (1) specify the amount or extent of the incidental taking of the species; (2) specify the

9  "reasonable and prudent measures" that the expert agency considers necessary or appropriate to

10 minimize such impact; (3) set forth the "terms and conditions" that must be complied with by the

11 action agency to implement the reasonable and prudent measures (including, but not limited to,

12 reporting requirements); and (4) specify the procedures to be used to handle or dispose of any

13 individual animals actually taken.  ONRC, 476 F.3d at 1034, citing 16 U.S.C. § 1536(b)(4); 50

14 C.F.R. § 402.14(i).  In addition, the action agency must "report back to [relevant expert agency] on

15 the action's progress and its impact on the species '[i]n order to monitor the impacts of incidental

16 take.'"  ONRC at 1034, quoting 50 C.F.R. § 402.14(i)(3).  The action agency "must immediately

17 reinitiate consultation with [the expert agency] if the amount or extent of incidental taking is

18 exceeded."  ONRC at 1034-35, citing 50 C.F.R. § 402.14(i)(4), 402.16(a).  An action agency is

19 exempt from penalties for incidental takings of listed species if the agency is in compliance with the

20 terms and conditions specified within an incident take statement.  16 U.S.C. § 1536(o); 50 C.F.R. §

21 402.14(i)(5).

22

23 III.    National Forest Management Act ("NFMA")

24    The NFMA directs the Secretary of Agriculture, by and through his designee, the Forest

25 Service, to "develop, maintain, and, as appropriate, revise land and resource management plans for

26 units of the National Forest System."  16 U.S.C. § 1604(a).  In carrying out its management

27 directive, the Forest Service employs a three-tiered process.  See generally id. § 1604; 36 C.F.R. §

28

7

219.2.  At the highest tier, the Chief of the Forest Service promulgates national uniform regulations that set broad guidelines to which subsequent management plans must conform.  36 C.F.R. § 219.2(a).  At the next tier, the Forest Service prepares regional "land and resource management plans" that cover particular national forest "units."  16 U.S.C. § 1604(a).  Such second-tier plans are produced by the supervisor of the national forest, grassland, prairie or other comparable administrative unit.  36 C.F.R. § 219.2(b).  Forest plans are broad, programmatic planning documents that guide all natural resource management activities and must provide for multiple uses including outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness.  See id. at § 1604(e)(1); 36 C.F.R. § 219.1(b); see also Wilderness Soc'y v. Thomas, 188 F.3d 1130, 1132 (9th Cir. 1999).  The final tier of the process is the implementation stage, "during which individual site specific projects, consistent with the forest plan, are proposed and assessed."  Ecology Ctr., Inc. v. U.S. Forest Service, 192 F.3d 922, 924 n.2 (9th Cir. 1999); see also 16 U.S.C. § 1604(i).

IV.    Administrative Procedures Act

        The issuance of a biological opinion constitutes a "final agency action" for the purpose of a challenge under the Administrative Procedures Act ("APA").  Bennett, 520 U.S. at 177-178.  Under the APA, an agency action or decision may be set aside if the court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A court may also "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The Supreme Court has laid out a two-part test to determine whether an agency has acted "not in accordance with law."  See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  The court must first look to the statute's language to determine "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id.  The reading of the statute must be the "only plausible interpretation."  Regions Hosp. v. Shalala, 522 U.S. 448, 460 (1998).  "If, however, the court determines Congress has not directly addressed the precise question at issue . . . the question for the

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  court is whether the agency's answer is based on a permissible construction of the statute."

2  Chevron, 467 U.S. at 843.  If the construction is permissible, the court must defer to the agency, but

3  the court need not defer to agency regulations "if [the agency] construe[s] a statute in a way that is

4  contrary to congressional intent or that frustrates congressional policy."  Akhtar v. Burzynski, 384

5  F.3d 1193, 1198 (9th Cir. 2004).  A court's inquiry under the APA must be "searching and careful,"

6  but the standard of review is ultimately narrow.  Marsh v. Oregon Natural Resources Council, 490

7  U.S. 360, 378 (1989) (internal quotations and citations omitted).

8

9  DISCUSSION

10      Plaintiffs contend that the FWS and NMFS biological opinions are invalid for failure to

11  include ITSs, and that the Forest Service improperly relied upon these defective opinions in issuing

12  the forest plans for the four southern California forests.[1]  Defendants counter with two arguments.

13  Firstly, they contend that plaintiffs have no standing to challenge the expert agencies' decisions not

14  to issue ITSs, because the issuance of an ITS is relevant only to the Federal agency seeking an

15  exemption from Section 9.  Secondly, they argue that a programmatic plan does not authorize, fund

16  or carry out any actual project; therefore, plaintiffs both lack standing to sue and, if they had

17  standing, would lose on the merits.  The court's analysis will track defendants' two arguments.

18

19  I.    Standing

20      Under the U.S. Constitution's limited grant of authority to the federal judiciary, a plaintiff

21  may not bring a "case" or "controversy" unless it has standing to do so.  See U.S. Const. art. III, § 2;

22  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  To establish standing, a plaintiff must

23  show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or

24  imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action

25  of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be

26  redressed by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw, 528 U.S. 167, 180-181

27  (2000).  An association has standing to bring suit on behalf of its members when its members would

28

9

United States District Court

For the Northern District of California

1   otherwise have standing to sue in their own right, the interests at stake are germane to the

2   organization's purpose, and neither the claim asserted nor the relief requested requires the

3   participation of individual members in the lawsuit.  Id. at 181, citing Hunt v. Washington State

4   Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).  Defendants do not challenge plaintiffs'

5   standing to bring suit on behalf of its members.  Rather, defendants argue that neither plaintiffs nor

6   their members are affected by the lack of ITSs.[2]

7

8        A.      Whether ITSs Serve Merely As A Shield From Section 9 Liability

9        Congress amended the ESA in 1982 to provide for ITSs in agency consultations.  See Pub. L.

10  No. 97-304 § 4.  A purpose of the ITS provision was to reconcile Section 9's ban on taking with

11  Section 7's provision of a consultation process to provide exemptions for individuals and Federal

12  agencies.  Congress was concerned to shield a Federal agency that "compl[ies] with the rigorous

13  demands of the Section 7 consultation process" in taking an action but whose action results in some

14  incidental level of take.  H.R. Rep. No. 97-567 at 15.  Defendants urge that this shielding of agencies

15  and individuals from Section 9 liability for incidental take is the *sole* purpose of the ITS provision.

16  Since the ITS provision benefits only the agencies and individuals consulting on an action, any lack

17  of an ITS cannot harm plaintiffs, according to defendants.

18       The Court of Appeals for the Ninth Circuit has already considered and rejected the argument

19  that the issuance of an ITS serves the sole purpose of shielding the action agency.  In Oregon

20  Natural Resources Council ("ONRC") v. Allen, 476 F.3d 1031 (2007), the court upheld a challenge

21  brought by certain conservation groups against the FWS regarding an ITS that allowed the taking of

22  "all" northern spotted owls associated with a certain timber harvest.  Id. at 1032.  The plaintiff

23  conservation groups argued that the ITS in question could not be valid because it did not require

24  reinitiation of consultation upon the reaching of a certain threshold.  Id. at 1039.  The FWS argued

25  that an ITS need not provide for re-initiation of consultation, because the sole purpose of an ITS was

26  to lift the Section 9 bar on take for agencies that had followed Section 7's consultation process.  Id.

27  at 1040.  The court held that such an interpretation would ignore the limited nature of the ITS

28

10

exemption and "read[] out the statutory and regulatory provisions for and congressional expectations of the monitoring of incidental take during the project." Id. According to the court, "The terms of an [ITS] do not operate in a vacuum. To the contrary, they are integral parts of the statutory scheme, determining, among other things, when consultation must be reinitiated." Id., quoting Arizona Cattle Grower's Ass'n v. United States Fish & Wildlife, 273 F.3d 1229, 1251 (9th Cir. 2001).

To hold the plaintiffs have no standing because only the Federal agencies in question have an interest in whether or not an ITS issues would require ignoring the statutory and regulatory scheme of which the ITS provision is a part. The grant of an ITS involves responsibilities on the part of the Federal agency as well as protection from liability. Among other things, such agency must, following the ITS's guidance, report on the progress of its action and the action's impacts, and reinitiate consultation immediately if the amount of incidental take provided for in the ITS is exceeded. 50 C.F.R. § 404.12(i)(3) & (4). The purpose of these provisions is to ensure that the allowance of incidental take does not undermine the ESA regime of protecting endangered species. The benefits of compliance accrue, therefore, to all groups and individuals with an interest in species preservation.

B.    Whether A Programmatic Plan Can Result In Incidental Take

Defendants invite the court to plumb the mysteries of the metaphysics of causation, suggesting that a programmatic forest plan cannot have any effect upon listed species until site-specific projects are implemented under the plan's guidance. According to defendants, the forest plans cannot cause incidental take because they are programmatic in nature and do not implement any actual projects. While the biological opinions anticipated that incidental take would potentially occur, such incidental take was anticipated to occur as a result of future specific actions implemented under the guidance of the plans, according to defendants. Therefore, no take would result from the revised plans. Defendants' position appears to be that the forest plans do not "do" anything in and of themselves. The plan is merely a piece of paper until site-specific projects are implemented. As long as those projects undergo their own Section 7 consultations, it does not

11

United States District Court

For the Northern District of California

1   matter whether the programmatic-level forest plans have done so.  Defendants use this rationale to

2   argue both that plaintiffs lack standing and that their case lacks merit.[3]

3        The argument ignores the Ninth Circuit cases holding that a higher-level plan does affect the

4   environment albeit indirectly.  In Citizens for Better Forestry v. U.S. Dept. of Agriculture, 341 F.3d

5   961 (2003), the court reversed the district court's grant of partial summary judgment to the

6   government where several environmental groups challenged implementation of a new national forest

7   management policy.  The government argued that the plaintiffs lacked standing because the top-tier

8   policy did not directly affect the physical environment such that there could be a sufficient

9   connection between the asserted procedural injury and the concrete interests at stake.  Id. at 973.

10  The court rejected this argument, holding that the top-tier plan did affect the environment through

11  the effect it exerted on the lower-level plans.  Even though a higher-level plan's concrete effect

12  might be mitigated at the site-specific level, such plan still represents an important decision.  To

13  decide otherwise would require the court to assume that Congress included "useless procedural

14  safeguards" or a "superfluous step" in the process it designed for designating wilderness areas.  Id.,

15  quoting Idaho Conservation League v. Mumma, 956 F.2d 1508, 1516 (9th Cir. 1992).

16       Indeed, the biological opinions examine land use zone data and impact minimization

17  measures provided by the Forest Service and use that data to assess impacts on the species in

18  question on a species-by-species basis.  See, e.g., FWS AR 1 (FWS biological opinion) at 292-293

19  (analyzing general effects of forest plans' proposed zoning and related usage levels on the Parish's

20  checkerbloom).  Although the opinions must examine these potential impacts at a higher level of

21  abstraction and with relatively less specificity than would be the case with a project-level plan, the

22  opinions nevertheless reach conclusions that the activities for which various parts of the forests are

23  zoned will likely result in various types of take.  Defendants assert in a conclusory fashion that

24  issuing an ITS in a programmatic consultation is impractical.[4]  Yet it was not impractical for the

25  expert agencies to determine that the revised plans would not violate 16 U.S.C. section 1536(a)(2)

26  and that the plans would result in some level of harmful impacts to listed species.[5]  The expert

27  agencies provided assessments based upon the anticipated impacts of the revised plans' zoning

28

1    choices.  These choices represent real decisions with real consequences, however indirect.  The court

2    holds that a programmatic forest plan does have an effect upon subsequent land use decisions and

3    therefore upon the land itself.  Plaintiffs have standing.

4

5    II.    Merits

6           Defendants' argument on the merits is substantially the same as the argument just discussed.

7    According to defendants, even if plaintiffs have standing, they cannot prevail, because the

8    programmatic-level plans do not involve incidental take.  If no take can occur as a result of the

9    action, it is rational for an expert agency to omit an ITS.  This argument fails on the merits for the

10   reasons discussed above, and the cases upon which defendants rely do not support a contrary

11   determination.

12          In Gifford Pinchot v. U.S. Fish and Wildlife Service, 378 F.3d 1059 (9th Cir. 2004), the court

13   approved of the FWS's decision to rely solely on analysis in the Northwest Forest Plan in

14   developing its biological opinion, deferring any independent jeopardy analysis instead to future

15   biological opinions that would address specific projects.  Id. at 1064, 1067-1068.  As defendant

16   states, the court noted that it "ha[d] previously approved programmatic environmental analysis

17   supplemented by later project-specific environmental analysis."  Id. at 1068, citing Salmon River

18   Concerned Citizens v. Robertson, 32 F.3d 1346, 1356 (9th Cir. 1994) (holding that a comprehensive

19   programmatic impact statement required by the National Environmental Policy Act "generally

20   obviates the need for a subsequent site-specific or project-specific impact statement, unless new and

21   significant environmental impacts arise that were not previously considered").  The Gifford Pinchot

22   court stressed with great clarity, however, that it was hesitant to fault the agency's reliance on the

23   Northwest Forest Plan because that plan was "a unique management plan that has already been

24   approved by this court."  Gifford Pinchot at 1068.  The court specifically held that the FWS could

25   rely upon the unique Northwest Forest Plan in developing its programmatic-level biological opinion

26   and defer independent jeopardy analysis to the site-specific project state.  Id.  It did not suggest that

27

28

United States District Court
For the Northern District of California

13

a biological opinion on a forest plan could routinely omit an ITS because the plan was programmatic rather than site-specific.

Defendants also rely upon <u>Western Watersheds Project v. Bureau of Land Management</u>, 552 F. Supp. 2d 1113 (D. Nev. 2008), arguing that this case in indistinguishable from the instant case.  In that case, the court allowed the FWS to defer issuing an ITS with a biological opinion on an amendment to a fire management plan.  <u>Id.</u> at 1139.  That case, however, dealt with a top-tier national plan, <u>see id.</u> at 1120, which is yet a further step removed from implementation than the second-tier regional programmatic plan at issue in this instant case.  Even if <u>Western Watersheds</u> were controlling upon this court, it would not compel a particular outcome in the instant case.[6]  Indeed, the Nevada court was also careful to cabin its holding to the context of that case.  <u>Id.</u> at 1139.

Defendant expert agencies go so far as to contend that they could not lawfully have issued ITSs in this case under the rule of <u>Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife</u>, 273 F.3d 1229 (9th Cir. 2001).  According to defendants, <u>Arizona Cattle</u> stands for the proposition that no ITS can issue unless the expert agency determines that the plan viewed by itself and without reference to lower-tier plans will cause take.  As explained above, the revised plans do affect the take of the species in question.  Moreover, <u>Arizona Cattle</u> does not stand for such a broad proposition.  In that case, an association of ranchers challenged the issuance of ITSs by the FWS that precluded the ranchers from grazing their cattle in certain areas because such grazing could potentially harm endangered species.  <u>Id.</u> at 1233-35.  The court found that the FWS acted in an arbitrary and capricious manner by failing to show that the endangered species in question actually existed on the restricted land.  <u>Id.</u> at 1244-1245.  In the instant case, there is no dispute that almost fifty protected species may be affected by the revised forest plans.  It is indeed a stretch to suggest that <u>Arizona Cattle</u> somehow forced the expert agencies to refrain from issuing ITSs with the opinions at issue.[7]

A second way to view defendants' contention is as a challenge to the premise that the promulgation of the forest plans at issue constitute "agency action" for the purposes of the ESA.  If

14

it does not, then the ESA's provisions regarding the issuance of an ITS, <u>see</u> 16 U.S.C. § 1536(b)(4), do not apply, and the expert agencies do *not* act "not in accordance with law," <u>see</u> 5 U.S.C. § 706(2)(A), by ignoring those provisions.  Plaintiffs contend that the forest plans, which have an indirect effect on the forests and species living within them, do constitute such an agency action. Defendants, on the other hand, describe the plans as "completely strategic," asserting that the plans do not authorize or execute anything or change any legal rights.

Firstly, there is no dispute that forest plans are considered ongoing agency actions for the purpose of determining whether they are subject to the ESA's consultation requirements.  <u>See</u> <u>Pacific Rivers Council v. Thomas</u>, 30 F.3d 1050, 1053-1054 (9th Cir. 1994) (upholding challenge to Forest Service's failure to engage in consultation on a land resource management plan).  This is sensible, since forest plans contain provisions to which all third-tier projects must adhere and "have an ongoing and long-lasting effect even after adoption."  <u>Id.</u> at 1053.  Indeed, the Forest service engaged in the Section 7 consultation process in developing the 2005 revised plans.

Secondly, the ESA makes no distinction between an "agency action" that triggers consultation and an "agency action" for which an ITS is required.  "Agency action" is statutorily defined for the purposes of Section 7 as "any action authorized, funded, or carried out by [an] agency."  16 U.S.C. § 1536(a)(2).  That section sets forth both the circumstances under which interagency consultation on an "agency action" is appropriate and those under which the provision of an ITS pertaining to an "agency action" is required.  <u>See</u> 16 U.S.C. § 1536(a) & (b)(4).  There is, in short, no reason to interpret the term "agency action" for the purposes of the ITS provision differently than for the provision compelling consultation.  Thus, if the promulgation of a programmatic forest plan is an agency action for the purposes of triggering the requirement for consultation—and under <u>Pacific Rivers</u>, it is—then it is likewise an agency action for the purposes of determining when an ITS is necessary.  This version of defendants' argument also misapprehends the nature of defendants' Section 7 obligations.[8]

15

1    In summary, the court holds that the FWS and NMFS acted "not in accordance with law,"

2    see 5 U.S.C. § 706(2)(A), when they failed to issue ITSs with their biological opinions on the 2005

3    revised forest plans for the four southern California forests.

4

5

6    CONCLUSION

7    For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED and

8    defendants' cross-motion for summary judgment is DENIED.  Plaintiffs and defendants shall file,

9    within twenty-one (21) days of entry of this order, simultaneous briefs, not exceeding fifteen (15)

10   pages each, proposing the appropriate form(s) of relief.  Simultaneous reply briefs, not exceeding ten

11   (10) pages each, shall be filed within twenty-eight (28) days of entry of this order.

12

13   IT IS SO ORDERED.

14

15

16   Dated: June 8, 2009

     _____
     MARILYN HALL PATEL
17   United States District Court Judge
     Northern District of California

18

19

20

21

22

23

24

25

26

27

28

16

**ENDNOTES**

1.      Venue is proper in this district because plaintiffs Sierra Club and Center for Biological Diversity reside here and no real property is involved in the action. <u>See</u> 28 U.S.C. § 1391(e); <u>see also</u> Complaint ¶ 4.

2.      The day after oral argument was heard in this case, the U.S. Supreme Court handed down its opinion in <u>Summers v. Earth Island Institute,</u> ___ U.S. ___ (2009), slip op. at 2009 WL 509325.  That case dealt with the standing of environmental groups to challenge certain Forest Service regulations. The questions dealt with by the Court in <u>Earth Island</u> were, however, different from those at issue in the instant case.  The <u>Earth Island</u> plaintiffs initially challenged regulations allowing a salvage sale of timber on areas of less than 250 acres without a period of public comment.  The basis for the challenge was that implementation of such regulations would harm organization members who visited a certain area of Sequoia National Forest slated to be subject to a salvage sale.  The parties settled their dispute over the sale at issue.  Thereafter, the district court nevertheless enjoined application of the regulations, finding them to be contrary to law.  The Supreme Court held this to have been error.  Absent some live dispute over a concrete application of the regulations, no constitutional case or controversy existed, and the plaintiffs did not have standing.  In the instant case, plaintiffs challenge the government's procedures as they have been concretely applied to the four southern California forests and the forest plans governing them.

3.      Defendants argue that plaintiff Sierra Club has not established standing because no declaration was filed by a representative of plaintiff Sierra Club with plaintiffs' motion.  The Sierra Club corrected this oversight by filing such a declaration with plaintiffs' reply, and the court can adduce no unfair prejudice to defendants in considering the declaration.
        Defendants also argue that the California Native Plant Society cannot be granted relief and therefore lacks standing because ESA sections 7(b)(4) and 7(o)(2) do not apply to plant species. Plaintiff counters that section 7(b)(4), which requires incidental take statements, provides no exception for plant species.  It is unnecessary for the court to resolve this question.  Like the other plaintiffs, the California Native Plant Society is seeking injunctive relief, not individual damages.  As long as at least one of the plaintiffs has standing, the court may reach the merits of the argument.  <u>See</u> <u>Massachusetts v. E.P.A.</u>, 549 U.S. 497, 517 (2007); <u>Board of Natural Resources of State of Wash. v. Brown</u>, 992 F.2d 937, 942 (9th Cir.1993).

4.      Even if, under these circumstances, defendants had presented evidence of the impracticability of specifying a numerical value of incidental take that would trigger further consultation, the expert agencies could use something other than a numerical value.  <u>See</u> <u>Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife</u>, 273 F.3d 1229, 1249-1250 (9th Cir. 2001) (holding that FWS need not state a numerical take limit where it has established that such numerical value cannot be practicably obtained); <u>see also</u> <u>Natural Resources Defense Council v. Evans</u>, 364 F. Supp. 2d 1083, 1136 (N.D. Cal. 2003) (LaPorte, Mag. J.), 2003 U.S. Dist. LEXIS 20400, at *149-150 (rejecting argument that NMFS programmatic biological opinion need not include an ITS because NMFS purportedly could not estimate the amount of incidental take).

5.      The expert agencies' explicit findings about the revised plans' negative impacts upon the species in question belie defendants' suggestion that "based on the best available data, no incidental take is anticipated," which would justify not issuing an ITS under current FSA and NMFS policy.  <u>See</u> ESA Section 7 Consultation Handbook at 4-48 (March 1998), <u>available at</u> http://www.fws.gov/endangered/pdfs/Sec7/handbook/CH4.PDF.

17

United States District Court

For the Northern District of California

1

2

6.	While relying on <u>Gifford Pinchot</u>'s general approach, the <u>Western Watersheds</u> court agreed that that case "does *not* indicate that an ITS is not required for a programmatic biological opinion." <u>Western Watersheds</u>, 552 F. Supp. 2d at 1139 (emphasis added).

3

4

5

7.	It is worth noting that the biological opinions issued by the FWS and NMFS state that consultation on the revised plans must be reinitiated if, among other things, "the amount or extent of taking specified in the incidental take statement is exceeded." This language was included despite the fact that an incidental take statement was not issued. The inclusion of this plainly contradictory language would provide support for a finding that the agencies acted arbitrarily and capriciously.

6

7

8

9

8.	Defendants also state that "the proposed action here was the approval of the Revised Plans . . . ." Def.'s Reply at 10. The meaning of this is unclear. The Forest Service did not submit for consultation an assessment of the impact of approving the plan—which, no doubt, involves the death of some number of trees. Rather, the expert agencies' biological opinions analyzed the substantive effects they foresaw arising from the decisions about forest zoning and use made in the forest plan. The proposed action being consulted upon had to do with the substance of the plan, not its mere existence.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18