UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, *et al.*,<br><br>　　　　　Defendants.<br>_____/ | No. C-08-1278 EMC<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR RECONSIDERATION**<br><br>**(Docket No. 78)** |

Defendants' motion for reconsideration came on for hearing before the Court on November 28, 2011. Docket No. 78. For the reasons set forth below, the Court **GRANTS in PART** Defendants' motion for reconsideration.

## I.　FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs Center for Biological Diversity, Los Padres Forestwatch, Sierra Club, Defenders of Wildlife, and California Native Plant Society filed this suit against Defendants U.S. Fish and Wildlife Service ("FWS"), National Oceanic and Atmospheric Administration ("NOAA"), National Marine Fisheries Service ("NMFS"), and U.S. Forest Service ("USFS"), alleging violations of the Endangered Species Act ("ESA"). Plaintiffs challenged the USFS's 2005 revised forest plans for the Angeles, Cleveland, Los Padres, and San Bernardino National Forests. Compl. ¶ 1. The revised forest plans were issued pursuant to regulations implementing the National Forest Management Act ("NFMA"), which required USFS to update the forest plans every ten to fifteen years. Docket No. 39 at 2-3 ("Summary Judgment").

Before issuing the revised forest plans, USFS was required by the ESA to prepare two biological assessments analyzing the potential effects of the revised plans on ESA-listed species. Summary Judgment at 3. Upon completing the biological assessments, USFS engaged in Section 7 consultation[1] with FWS and NMFS to prepare Biological Opinions ("BiOps") that examined the forest plans' impacts on a species-by-species basis. Summary Judgment at 4. In their BiOps, FWS and NMFS concluded that the revised plans were unlikely to jeopardize any ESA-listed species or adversely modify any designated critical habitat. Summary Judgment at 4. However, both BiOps identified USFS programs that were likely to adversely affect listed species, such as the use of roads and recreational sites that could result in the crushing of animals, invasion of non-native species, and harmful vegetation clearing. Summary Judgment at 4. Despite these likely adverse impacts, neither agency issued an Incidental Take Statement ("ITS") because the agencies could not definitively anticipate the amount, extent, location, or timing of any potential take. Summary Judgment at 5.

Based on FWS's and NMFS's failure to issue an ITS with the BiOps, the Court (per Judge Patel) found that Defendants did not act in accordance with the law and granted summary judgment to Plaintiffs in 2009. Summary Judgment at 16. After the parties submitted remedy briefs in August 2009, the Court subsequently found violations of NMFS and the National Environmental Policy Act ("NEPA") in two companion cases that challenged the forest plans themselves.[2] Docket No. 53 at 1.

---

[1] Section 7 consultation under the ESA begins when the action agency prepares to take actions that may impact an endangered or threatened species. 16 U.S.C. § 1536 (2006). The action agency must consult with FWS and/or NMFS to ensure that any action taken by the action agency does not jeopardize the continued existence of a listed species. *Id.* § 1536(a)(2). FWS and NMFS are responsible for issuing a Biological Opinion ("BiOp") that determines whether the action is likely to jeopardize a listed species. 50 C.F.R. § 402.14(g) (2011). If FWS or NMFS concludes that an action is unlikely to jeopardize the existence of a listed species but is likely to result in incidental take of a species, the agency must issue an Incidental Take Statement ("ITS") with the BiOp. 16 U.S.C. § 1536(b)(4). The ITS exempts a specified number of incidental takings from Section 9's general prohibition against takings, and must: (1) specify the impact of the incidental taking on the species, (2) specify reasonable and prudent measures that FWS or NMFS considers necessary or appropriate to minimize such impact, (3) set forth terms and conditions with which the action agency must comply in order to implement the reasonable and prudent measures, and (4) specify the procedures to be used to handle or dispose of individuals that are taken. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). As long as the takings complies with the ITS terms and conditions, an action agency is exempt from penalties for those takings. 16 U.S.C. § 1536(o)(2). Otherwise, a taking without a valid ITS or permit constitutes a Section 9 violation. *Id.* § 1538(a) (2006).

[2] The two companion cases are *Center for Biological Diversity v. U.S. Department of Agriculture*, C 08-3884, and *California Resources Agency v. U.S. Department of Agriculture*, C 08-1185.

In order to coordinate the relief granted in all three actions, the Court postponed granting relief, "pending completion of the briefing in, or settlement of, those actions." Docket No. 53 at 2. Following the Court's acceptance of a settlement in one of the companion cases in January 2011, the parties submitted supplemental briefing regarding the impact of that settlement on their requested relief. Docket Nos. 56, 57.

In June 2011, the Court issued an Order granting injunctive relief and requesting further information from Defendants. Docket No. 59 ("Order"). The Order consisted of three parts. First, the Court requested further information with respect to activities that had or were occurring since the 2005 plans were developed. Order at 2. Second, the Court ordered FWS and NMFS to prepare and submit ITS that were consistent with the ESA, including specific points the ITS were to address. Order at 3-5. Third, the Court ordered Defendants to take particular actions in the interim, including eliminating adverse impacts to listed species when performing fire suppression activities, monitoring steelhead trout populations, and closing areas to mining, construction, or recreational shooting. Order at 5-6. After the case was transferred to the undersigned, Defendants moved for leave to file a motion for reconsideration, which this Court granted. Docket No. 75. The Court now considers Defendants' motion for reconsideration of the June 2011 Order.

## II. DISCUSSION

A. Standard of Review

A motion for reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). Thus, "a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999). A motion for reconsideration cannot be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation. *Kona Enters.*, 229 F.3d at 890.

///

///

B.  Information Requests

In Part A of the Order, the Court requested from Defendants further information with respect to activities that have occurred or are occurring in the affected Forests. Order at 2-3. Defendants request that the Court vacate the information requests or in the alternative, relieve USFS of the two most burdensome requests, Information Requests Nos. 9 and 11. Motion at 18. Defendants have since responded to most of the information requests, but still seek relief from Information Requests Nos. 9 and 11. Reply at 8; Docket No. 71.

In their papers and at the hearing, Plaintiffs stated that they did not oppose the relief sought by Defendants because Plaintiffs believe that Defendants have already satisfied the information requests. Opp. at 14. The Court thus finds that Defendants have fulfilled its obligations under Part A of the Order, and need not provide any further information.

C.  Incidental Take Statement

In Part B of the Order, the Court provided detailed guidelines that FWS and NMFS were to address in preparing the ITS. Order at 3-5. Defendants request that the Court vacate its instructions relating to the required substance of the ITS.

Generally, "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end; the case must be remanded to the agency for further action consistent with the corrected legal standards." *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008). Unless there is "substantial justification for doing otherwise, a reviewing court may not, after demanding that additional evidence is requisite for adequate review, proceed by dictating to the agency the methods, procedures, and time dimension of the needed inquiry." *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976).

The Court finds that there is no substantial justification in this case that would warrant detailed instructions regarding the substance of the ITS. For example, there is no indication that Defendants have repeatedly failed to adhere to the ESA in this case. *Compare with Am. Rivers v. NOAA Fisheries*, CV04-00061-RE, 2006 U.S. Dist. LEXIS 69442, at *5-6 (D. Or. Sept. 26, 2006) (finding that a substantial justification existed where the government agencies repeatedly failed to

4

1  produce a valid biological opinion). The Court thus strikes these detailed instructions from Part B of
2  the Order. Order at 4:2-5:10.

3      Defendants FWS and NMFS shall prepare and submit ITS consistent with their respective
4  agency mandates and guidelines, and the applicable law. In striking this portion of the Order, the
5  Court emphasizes that the ITS must be consistent with the law[3] and the Court's decision on
6  summary judgment. The Court takes notice that Defendants have filed an opposed motion to extend
7  the time to complete an ITS until October 2013, as Defendants intend to reissue new Biological
8  Assessments and BiOps. Docket No. 81 at 8. The Court will issue a separate Order regarding the
9  revised timing of the remand.

10 D.    <u>Interim Injunctive Relief</u>

11     In Part B of the Order, the Court also ordered that Defendants take interim steps to ensure
12 protections for affected species. Order at 5-6. At the hearing, Defendants stated that they do not
13 challenge the issuance of injunctive relief generally, but only request relief from: (1) implementing a
14 steelhead trout monitoring program, (2) preparing a report on the state of suction dredge mining in
15 the San Gabriel River and its impact on the Santa Ana Sucker, and (3) exercising all necessary
16 protection of habitat and listed species when conducting fire suppression activities.

17 ///
18 ///
19 ///
20 ///
21 ///
22 ///

---

[3] For example, the Ninth Circuit has found that Congress "clearly declared a preference for expressing take in numerical form, and an [ITS] that utilizes a surrogate instead of a numerical cap on take must explain why it was impractical to express a numerical measure of take." *Or. Natural Res. Council*, 476 F.3d at 1037 (holding that an ITS violated the ESA when it contained no numerical cap on take and failed to explain why it did not have a numerical cap); *see also Wild Fish Conservancy*, 628 F.3d at 531 ("Preferably, the trigger is numerical, but the Service may use a surrogate . . . . If a surrogate is used, the agency must articulate a rational connection between the surrogate and the taking of the species"). Such binding precedent, as well as the applicable statutes and regulations – including 16 U.S.C. § 1536(b)(4), 50 C.F.R. § 402.14(i), and 50 C.F.R. § 18.27 – should likely inform and guide the Defendants FWS and NMFS on remand.

1. Injunctive Relief Standard[4]

Defendants' primary argument is that Plaintiffs have failed to demonstrate that the four-factor injunctive relief test was met in this case. Motion at 4; Reply at 2. "According to the well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 54 U.S. 388, 391 (2006). Thus, a plaintiff must demonstrate: (1) that the plaintiff has suffered an irreparable harm; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that the balance of hardships between the plaintiff and defendant warrants an equitable remedy, and (4) that a permanent injunction does not disserve the public interest. *Id.* The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court. *Id.* The Ninth Circuit has applied this four-factor test to injunctions issued to remedy ESA violations. *E.g.*, *Cal. ex rel. Lockyer v. USDA*, 575 F.3d 999, 1019-20 (9th Cir. 2009).

        a. Likelihood of Irreparable Injury

Defendants argue that an injunction was not warranted in this case because Plaintiffs failed to demonstrate likely irreparable harm. Motion at 6. In general, environmental injuries are considered irreparable because they "seldom [can] be adequately remedied by money damages, and [are] often permanent or at least of long duration." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). However, this does not mean that every environmental injury warrants injunctive relief; a plaintiff must still demonstrate that an irreparable injury is likely in the absence of an injunction. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008).

Under the ESA, the Ninth Circuit has found that "[a] reasonable certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under section 9 of the ESA." *Marbled Murrelet v. Pac. Lumber Co.*, 83 F.3d 1060, 1066 (9th Cir. 1996). A threat of extinction to

---

[4] In their motion, Defendants argued that reconsideration of the Court's injunctive relief is warranted because the Supreme Court's decision in *Monsanto Co. v. Geertson Seed Farms* constituted a material difference in law. Motion at 8 (citing 130 S. Ct. 2743); Reply at 2. At the hearing, Defendants conceded that *Monsanto* was not a material change in law. Even if *Monsanto* was a change in law, Defendants did not explain why this case was not argued to the Court earlier, given that it was decided a year before the Court's injunctive relief order and six months before Defendants' supplemental briefings on the remedies issue. In fact, Defendants cited to *Monsanto* in their supplemental briefings. Docket No. 56 at 3 (quoting *Monsanto Co.*, 130 S. Ct. 2743, 2761 (2010)).

6

the species is not required to satisfy this requirement. *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994). The Ninth Circuit has not specified how much harm is required, beyond stating that a definitive threat of future harm is required, not mere speculation. *Id.*

First, the Court finds that Plaintiffs have demonstrated a definitive threat of harm based on the BiOps, which concluded that the forest plans would likely have an adverse impact on listed species. Although Defendants argue that harm to the species as a whole is required, Ninth Circuit case law does not support this proposition. *Humane Society v. Guiterrez* concerned a TRO to prevent the federal defendants from lethally taking California sea lions under the Marine Mammal Protection Act; it did not concern irreparable harm under the ESA. 527 F.3d 788, 790 (9th Cir. 2008). Instead, the court found that although California sea lions were not listed under the ESA and the lethal take affected a tiny percent of the sea lion population,[5] "the lethal taking of the California sea lions is, by definition, irreparable." *Id.* The court then balanced this harm with the sea lion's expected consumption of between 212 to 2,094 ESA-listed salmonids to find that the impact to the salmonids was not an irreparable harm to the federal defendants that would tip the balance of harms in favor of the federal defendants. *Id.*

Defendants' remaining cases are district court opinions, two of which found that the plaintiff failed to demonstrate irreparable injury because the affected species were not impacted at all. *See Native Ecosystems Council v. U.S. Forest Serv.*, No. 4:11-cv-212-CWD, 2011 U.S. Dist. LEXIS 102089, at *24 (D. Idaho Sept. 9, 2011) (finding no likelihood of irreparable injury to the lynx because lynx did not exist in the Project area); *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. CV 10-1129-AC, 2011 U.S. Dist. LEXIS 105323, at *59 (D. Or. Sept. 19, 2011) (finding no likelihood of irreparable injury where mining activities were expected to have minor impact on the environment, and an agency biologist had found that "no SONCC coho salmon will be harmed at the time of extraction.").

---

[5] The federal defendants had proposed taking up to 85 California sea lions. As the California sea lion population was estimated at 238,000 in 2007, the proposed take would have impacted .0357% of the species as a whole. *See* NAT'L MARINE FISHERIES SERV., FINAL ENVIRONMENTAL ASSESSMENT: REDUCING THE IMPACT OF AT-RISK SALMON AND STEELHEAD BY CALIFORNIA SEA LIONS IN THE AREA DOWNSTREAM OF BONNEVILLE DAM ON THE COLUMBIA RIVER, OREGON AND WASHINGTON 3-5 (2008), *available at* http://www.nwr.noaa.gov/Marine-Mammals/Seals-and-Sea-Lions/Sec-120-Authority.cfm.

In the instant case, Defendants' BiOps found that the forest plans would likely adversely affect listed species. Summary Judgment at 5. Such effects included "the crushing of animals, invasion of non-native species[,] and harmful vegetation clearing." Summary Judgment at 5. Defendants' responses to the information requests indicates that these harms are not speculative, but have actually occurred. For example, three toads were crushed by vehicles in 2006, and 41 sticklebacks were found dead in a blocking net being used to exclude sticklebacks from a work site in 2011. Docket No. 71 ¶ 10; Docket No. 71-5 at 2. Additionally, many of the species that will be affected by the forest plans have small populations. For example, Plaintiffs argue that steelhead trout in the Los Padres and Cleveland National Forests "are perilously endangered, with less than 500 adults estimated in each of the two remaining populations." Opp. at 14. Because the expected harm to ESA-listed species is definitive, rather than speculative, and many of the species have small populations that will likely suffer adverse impact from any taking, Plaintiffs have demonstrated requisite irreparable injury.

Second, the Court finds that Defendants' failure to issue an ITS is a substantial procedural violation of the ESA that itself justifies an injunction. The Ninth Circuit has repeatedly found that the purpose of consultation under the ESA is to prevent future substantive violations of the ESA, such that "[i]rreparable damage is presumed to flow from a failure properly to evaluate the environmental impact of a major federal action." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985). Otherwise, "[i]f a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result." *Id.* Thus, pending completion of the agency's compliance with Section 7's consultation requirements, "[t]he remedy for a substantial procedural violation of the ESA – a violation that is not technical or de minimis – must therefore be an injunction of the project pending compliance with the ESA." *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (2005). The Ninth Circuit has continued to apply this rule after *Winter* and *Monsanto*. *E.g.*, *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 500 (9th Cir. 2011) (citing *Wash. Toxics Coal.* in affirming the district court's issuance of a permanent injunction); *see also Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010) (remanding to the district court to grant injunctive relief where the

defendant failed to comply with its procedural obligations under the ESA without requiring irreparable injury).

In the instant case, the BiOps found that the Forest Plans were likely to result in adverse impacts to ESA-listed species. Summary Judgment at 5. Although Defendants are correct in noting that Section 7 permits federal agencies to take actions that may result in the "take" of individual animals, Section 7 does not operate in a vacuum. Section 9 prohibits all *unpermitted* takings, regardless of whether they jeopardize the existence of the species. 16 U.S.C. § 1538. Without satisfying the procedural requirements of Section 7, including the issuance of an ITS, Defendants' take of an individual animal would be a substantive violation of Section 9.

Accordingly, the Court finds that irreparable harm is likely, and that an injunction is warranted to prevent future harm to the species and to ensure compliance with the ESA's procedural requirements. Compliance with the ESA's procedural requirements is necessary to prevent substantive violations of the ESA.

        b.      <u>Inadequate Remedy at Law</u>

The Ninth Circuit has explained that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages." *Cal. ex rel. Lockyer*, 575 F.3d at 1020; *Or. Natural Desert Ass'n v. Tidwell*, 2010 U.S. Dist. LEXIS 137612, at *12. In this case, the harm to the environment includes the taking of individual animals, invasion of non-native species, and harmful vegetation clearing. Summary Judgment at 5. Because it is prohibitively difficult or impossible to reverse such harms with money, the Court finds that this factor weighs in favor of issuing injunctive relief.

        c.      <u>Balance of Hardships</u>

The Ninth Circuit has found that "Congress had decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species." *Wash. Toxics Coal.*, 413 F.3d at 1035; *Nat'l Wildlife Fed'n*, 422 F.3d at 796; *see also TVA v. Hill*, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."). "Accordingly, when a plaintiff establishes a violation of the ESA, together with irreparable harm, an injunction is generally required to effectuate the purposes of

1 the ESA." *Nw. Envtl. Def. Ctr.*, 2011 U.S. Dist. LEXIS 105323, at *22. As Defendants do not cite
2 any competing harms, the Court finds that this factor weights in favor of issuing injunctive relief.

          d.      <u>Public Interest</u>

4 The Ninth Circuit requires that the Court recognize "the well-established public interest in
5 preserving nature and avoiding irreparable environmental injury." *Alliance for the Wild Rockies v.*
6 *Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011). Except for the fire suppression order, discussed
7 below, Defendants do not cite any harms to the public interest that the Court should balance with the
8 public's interest in preserving endangered and threatened species. Accordingly, the Court finds that
9 this factor weighs generally in favor of issuing injunctive relief.

      2.      <u>Specific Injunctive Relief</u>

11 Next, the Court examines the specific injunctive relief being challenged by Defendants, with
12 its general injunctive relief findings in mind.

13 First, Defendants challenge the steelhead monitoring and tracking program. The Court finds
14 that irreparable harm to the steelhead is likely in the absence of the program. The steelhead have a
15 small population, and there is a definitive threat of taking. Opp. at 7 n.3 (citing NMFS's 2005
16 BiOp) ("Adverse to steelhead 'may involve altering instream and riparian habitat; impeding passage
17 conditions; increasing sedimentation and turbidity; reducing the quantity and quality of spawning
18 and rearing areas; and harming, harassing, injuring, and killing steelhead.'"). Despite the BiOp's
19 finding that adverse effects to the steelhead was likely, Defendants failed to issue an ITS. Summary
20 Judgment at 5.

21 The Court finds that the steelhead monitoring and tracking program is necessary to prevent
22 irreparable harm to the species by ensuring that adverse impact to the steelhead will not rise to the
23 level of jeopardy. The purpose of an ITS is not limited to protecting the agency from violating
24 Section 9; the ITS permits a take while providing protections to listed species to ensure that adverse
25 impacts are minimized. 16 U.S.C. § 1536(b)(4). Thus, the ITS must also include a level of take so
26 that if take exceeds that permitted by the ITS, the action agency is required to reinitiate consultation.
27 *Or. Natural Res. Council*, 476 F.3d at 1038-41 (invalidating an ITS that did not trigger reinitiation
28 of consultation). To ensure that this level of take is not exceeded, an adequate monitoring program

is required. *Wild Fish Conservancy*, 628 F.3d at 531. In requiring a monitoring and tracking program for the steelhead, the Court requires protections that the species would have been afforded but for Defendants' failure to issue an ITS with the original 2005 BiOps.

Second, Defendants challenge the report on the state of suction dredge mining in the San Gabriel River and its effect on the Santa Ana Sucker. The Court finds that the report is not tailored to the ESA violation at issue, as the report is not necessary to prevent the harm that is likely to arise from Defendants' failure to prepare an ITS. While Plaintiffs argue that suction dredge mining was increasing at the time of remedy briefing in 2009, Plaintiffs do not demonstrate that suction dredge mining is ongoing or presents a current threat to the species. Instead, suction dredge mining is currently banned by the state of California. Reply at 12. Furthermore, Plaintiffs fail to demonstrate how a report on suction dredge mining is necessary to prevent irreparable harm, as there is no indication that a report is likely to affect the state's decisions regarding suction dredge mining. Defendants also state that they are working with the state to end all suction dredge mining in the San Gabriel River, regardless of the report. Reply at 12. Thus, because Plaintiffs have failed to demonstrate that a report on the state of suction dredge mining is necessary to prevent irreparable harm to the Santa Ana Sucker, the Court strikes this term from the injunction.

Finally, Defendants challenge the fire suppression order. The Court finds that the fire suppression order is necessary to prevent irreparable harm to listed species, as the 2005 Biological Opinion recognized the effect of fire suppression activities–such as the construction of firelines with bulldozers, the use of chemical fire retardants, and the establishment of fire camps–on listed species. The Court clarifies, however, that the Court's Order does not prevent Defendants from engaging in fire suppression activities. The Order is simply a qualifier, which requires that when Defendants do engage in fire suppression activities, that they make an effort to ensure that reasonably necessary protection of habitat and listed species is exercised.

The Court thus declines to modify the injunctive relief as to the steelhead monitoring program and the fire suppression order. The Court will strike the requirement that Defendants report on the state of suction dredge mining in the San Gabriel River and its effect on the Santa Ana Sucker.

### III. CONCLUSION

For the reasons stated above, the Court **GRANTS in PART** Defendants' motion for reconsideration. First, the Court finds that Defendants have satisfied the information requests in Part A of the Order. Second, the Court strikes from Part B the detailed instructions as to the ITS and the injunctive relief term requiring a report on the status of suction dredge mining in the San Gabriel River. The Court **DENIES** Defendants' motion for reconsideration as to the Order's issuance of interim injunctive relief regarding the steelhead monitoring program and the fire suppression order.

This order disposes of Docket No. 78.

IT IS SO ORDERED.

Dated: December 28, 2011

_____
EDWARD M. CHEN
United States District Judge